<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                                    :
MICHAEL GROSSBERG,                                  :
                                                    :
              Plaintiff,                            :
                                                    :          Civil Action No. 06-6145 (JAG)
              v.                                    :
                                                    :             **OPINION**
COMMISSIONER OF SOCIAL                              :
SECURITY ADMINISTRATION,                            :
                                                    :
              Defendant.                            :
_____:

<u>**GREENAWAY, JR., U.S.D.J.**</u>

Plaintiff Michael Grossberg ("Plaintiff") seeks review of the decision by the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff's application for disability benefits ("DIB"), pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).[1] Plaintiff argues that the Commissioner erred as a matter of law in denying his application because the Commissioner's decision is not supported by substantial evidence. For the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is not supported by substantial evidence, and should be vacated and remanded for further consideration.

_____

[1] This section of the Social Security Act (hereinafter the "Act") provides that any individual may obtain a review of any final decision of the Secretary made subsequent to a hearing to which he or she was a party. The federal district court for the district in which the plaintiff resides is the appropriate place to bring such action. 42 U.S.C. § 405(g).

# I. <u>PROCEDURAL HISTORY</u>

On January 20, 1999, Plaintiff filed an application for a period of disability and disability insurance benefits, pursuant to Sections 216(i) and 223(a) of the Social Security Act.  (Tr. 70-76.)[2]  The claim was denied initially and on reconsideration; however, Plaintiff timely filed a request for a hearing on November 20, 2000.  (Tr. 55, 61-64, 67.)  A hearing in this matter was held before Administrative Law Judge ("ALJ") Richard L. De Steno on May 18, 2001.  (Tr. 69.)

In a decision dated July 19, 2001, ALJ De Steno issued a decision finding Plaintiff disabled during the period running from July 15, 1998 through September 30, 2000.  (Tr. 17.)  In this decision, ALJ De Steno noted that Plaintiff suffered from tendinitis in the right shoulder, obesity, depression and a personality disorder, which are severe impairments within the meaning of the Act.  (Tr. 13.)  ALJ De Steno concluded, however, that "by October 1, 2000, the [Plaintiff] medically improved related to the ability to work such that his impairment no longer met a listing and he attained the residual functional capacity for medium work activity involving no greater than the simple repetitive tasks associated with unskilled work."  (Tr. 17.)

Plaintiff sought review of the decision by the Appeals Council.  However, the Appeals Council, in a letter dated August 8, 2002, concluded that there were no grounds for review.  (Tr. 5.)

Plaintiff then sought review of the decision in federal court on October 10, 2002.  (Compl. ¶ 8.)  Judge Hochberg reversed and remanded ALJ De Steno's decision on March 23, 2004, pursuant to 42 U.S.C. § 405(g).  (Tr. 249, 251-52, 254.)  Judge Hochberg remanded the

---

[2]  The Act instructs the Secretary to file, as part of the answer, a certified copy of the transcript of the record, including any evidence used to formulate the conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to said transcript.

case because Plaintiff appeared to have a non-exertional limitation, and, as a result, the Commissioner was not entitled to rely solely on the Medical-Vocational Guidelines (the "Grids") to determine whether there exist jobs that Plaintiff can perform.  (Tr. 250-51.)  Instead, Judge Hochberg found, ALJ De Steno must apply the Third Circuit's decision in Sykes v. Apfel, 228 F.3d 259 (3d Cir. 2000), which requires an ALJ to consider testimony from a vocational expert or other similar evidence, such as a learned treatise.  (Id.)

On August 12, 2004, Plaintiff and a vocational expert, Rocco J. Meola ("Meola"), testified before ALJ De Steno.  (Tr. 222-47.)  After this second hearing, at which Plaintiff was represented by counsel, ALJ De Steno issued a second decision,[3] again terminating Plaintiff's benefits effective October 1, 2000.  (Tr. 219.)  ALJ De Steno ruled that Plaintiff was not disabled within the meaning of the Act.  To support this ruling, ALJ De Steno found that:

1. The claimant has not engaged in substantial gainful activity since July 15, 1998.

2. The medical evidence establishes that the claimant has suffered from a severe impairment involving tendinitis in the right shoulder, obesity, depression and a personality disorder.

3. From July 15, 1998 through September 30, 2000, but not thereafter, the severity of the claimant's impairment met the requirements of sections 12.04 and 12.08, Appendix 1, Subpart P, Regulations No. 4.  The claimant's subjective complaints of disabling symptoms for the period since October 1, 2000 are not fully credible.  In all other respects, the evidence fails to establish an impairment that has met or equaled in severity the criteria of any impairment listed in

---

[3] ALJ De Steno's second decision is a determination of two sets of applications that have been consolidated.  The first is the DIB application dated January 20, 1999.  The second involves applications for disability insurance benefits and supplemental security income ("SSI") filed by Plaintiff on June 27, 2003, which were denied by the state agency initially and upon reconsideration.  (Tr. 208.)

Appendix 1, Subpart P, Regulations No. 4.

4.   By October 1, 2000, the claimant medically improved related to the ability to work such that his impairment no longer met the criteria of a listing and he attained the residual functional capacity for medium work activity involving no greater than the types of simple tasks associated with unskilled work. Even if his shoulder complaints were credited, he would have had the capacity for work involving lifting and carrying objects weighing up to 20 pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking, and sitting up to six in an eight-hour day; pushing and pulling left-arm but not right-arm controls; and pushing and pulling leg controls; limited to the types of simple tasks associated with unskilled work; without requiring lifting the right dominant arm above the shoulders.

5.   Since October 1, 2000, the claimant has not been able to perform any of his past relevant work.

6.   For the period since October 1, 2000, considering the claimant's ages, education, work experience, and residual functional capacity, jobs exist in significant numbers that he has had the capacity to perform, using as a framework, medical-vocational rules 203.29 and 203.22, Appendix 1, Subpart P, Regulations No. 4, in view of vocational expert testimony. Even if his complaints of shoulder limitation were credited and the second, reduced RFC were accepted, he would not be disabled, using as a framework, rules 202.21 and 202.14, in view of vocational expert testimony.

7.   The claimant was under a disability, as defined in the Social Security Act, from July 15, 1998 through September 30, 2000 (20 C.F.R. §§ 404.1520(d), 416.920(d)), but not thereafter.

(Tr. 217-18.)

Plaintiff alleges that, although ALJ De Steno's decision was dated August 27, 2004,

Plaintiff and/or Plaintiff's counsel did not receive the decision until October 12, 2004.  (Tr. 203.)

Plaintiff filed exceptions with the Appeals Council on November 15, 2004.  (Tr. 203.)  The

4

Appeals Council responded in a letter dated October 17, 2006, finding that Plaintiff's exceptions were not timely filed,[4] and ALJ De Steno's decision was the final decision of the Commissioner. (Tr. 201.)

On December 21, 2006, Plaintiff filed a Complaint in this Court, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), seeking reversal of the Commissioner's decision.

## II. <u>STATEMENT OF THE FACTS</u>

**A.      Background**

Plaintiff was born on September 25, 1951.  (Tr. 24.)  After Plaintiff graduated from high school, he had a varied work history.  He worked with a cosmetic company to "handle [] incoming labels."  (Tr. 25-26.)  Plaintiff then worked in a warehouse for an Italian foods distributor, where he checked outgoing orders of food products.  (Tr. 28.)  Plaintiff last worked as a cook in "'97 or '98."[5]  (Tr. 24.)  Most of Plaintiff's employment required standing for the majority of the day and lifting heavy objects.  (Tr. 26, 29-30, 31-32.)  Plaintiff has also received training in cooking and polishing jewelry.  (Tr. 36, 40.)

At the first hearing on May 18, 2001, Plaintiff testified that he was hospitalized in Trenton

---

[4] To appeal the decision to the Appeals Council, Plaintiff must file written exceptions within thirty days from the date Plaintiff receives the Notice of Decision.  The Appeals Council assumes that Plaintiff received the Notice of Decision within five days from the date shown on it, unless Plaintiff shows he did not receive it within the five-day period.  The Appeals Council will dismiss untimely exception submissions unless Plaintiff shows he had good reason for not filing the submissions on time.  (Tr. 206.)  To show that he did not receive the Notice of Decision within the five-day period, Plaintiff submitted a copy of an envelope from the hearing office to Plaintiff's counsel's firm, postmarked October 4, 2004.  However, the Appeals Council found that this was insufficient to establish that the hearing decision in this case was mailed on that date.  (Tr. 200.)

[5] Plaintiff testified that he was "not quite sure" of the year in which he last worked.  (Tr. 24.)

State Hospital from August of 1998 until April of 1999, for depression.  (Tr. 33, 48.)  Before he was hospitalized, Plaintiff was homeless, had no job or money, and was severely depressed and suicidal.  (Tr. 33.)  When he was released, he was "[s]till depressed, but not quite suicidal."  (Id.)  Plaintiff also testified that he had not looked for employment in the past six months because the Interim Assistance[6] that he receives would cease if he started working.  (Tr. 39.)

## B.    Claimed Disabilities

Plaintiff claims that he has been disabled since July 15, 1998, due to his psychiatric condition.  (Tr. 70, 305.)  His condition is alleged to include mental illness, depressive disorder, and major depressive disorder, with some personality disorder.  (Tr. 50.)

Plaintiff alleges that he suffers from depression and suicidal ideations.  (Tr. 33, 226.)  He sleeps a lot, and isolates himself from others.  (Tr. 51, 226, 228.)  He does not get along well with his peers, and has difficulty accepting direction and supervision from others.  (Tr. 51.)

Plaintiff also alleges physical impairments that render him disabled.  Plaintiff alleges that he has a shoulder injury that causes him pain, even when the shoulder is not in use. (Tr. 39, 229.)  Raising his right arm above shoulder level also causes Plaintiff pain.  (Id.)  Plaintiff also alleges problems with both ankles and his right knee, due to the fact that he is overweight.  (Tr. 49.)

---

[6] Interim Assistance is "a payment procedure developed by the State of New Jersey and the Social Security Administration.  It permits a client who has been released from a State psychiatric hospital and who has applied for Federal Supplemental Security Income (SSI) benefits to receive State funds and community Medicaid coverage while his or her SSI claim is being evaluated."  N.J. Admin. Code § 10:38-1.1 (West, Westlaw through June 16, 2008).

## C.     Medical Evidence Considered by the ALJ

In both decisions, ALJ De Steno noted that Plaintiff was examined by a number of physicians and at several medical centers.

### 1.     Dr. Nena Sapp

Dr. Nena T. Sapp, a clinical psychologist, completed a report on Plaintiff requested by the New Jersey Department of Labor, Division of Disability Services.  (Tr. 124.)  Plaintiff's psychiatric history consisted of "depressive symptoms and, in the fall of 1998, suicidal ideations coupled with the impression [that Plaintiff may cause] imminent harm to [him]self."  (Tr. 125.)

Plaintiff's most recent examination with Dr. Sapp was on January 22, 1999.  (Id.)  Dr. Sapp diagnosed Plaintiff with recurrent major depression.  (Id.)  Dr. Sapp noted that Plaintiff had been prescribed twenty milligrams of Prozac to take daily for his symptoms of depression.  (Tr. 127.)

Dr. Sapp noted, however, improvement in Plaintiff's ability to attend to tasks and to concentrate.  (Id.)  Plaintiff's judgment had also generally improved.  (Tr. 126.)  Plaintiff's mood was stable, but still somewhat vulnerable.  (Id.)  His concentration, attention, and memory were within normal limits.  (Id.)  Dr. Sapp noted that Plaintiff can adequately negotiate activities of daily living.  (Id.)  Plaintiff had no debilitating short or long term memory deficits, although he "can be slow to successfully adapt to a work situation."  (Tr. 127.)

Dr. Sapp provided a "good" prognosis, "provided Plaintiff stays with his medications and after-care supports."  (Id.)

### 2.     University of Medicine & Dentistry of New Jersey

On April 16, 1999, Plaintiff began an outpatient services program called "The Club," which provides outpatient services from the University of Medicine & Dentistry of New Jersey:

7

University Behavioral Healthcare ("UBHC").  (Tr. 163.)  On January 19, 2000, the clinical staff

completed a treatment plan for Plaintiff.  (Tr. 165.)  The attending medical practitioners were Dr.

Yuzefovich, a psychiatrist, and Jernee Montoya, the primary clinician.  (Tr. 163.)

 The treatment plan noted that Plaintiff is unemployed and living in SERV[7] housing.  (Id.)

Plaintiff was also found to lack a social support system, caused in part by problems with his family.

(Id.)  Plaintiff was unemployed at the time, and was hesitant to try transitional employment, even

though he lacked financial resources.  (Tr. 163.)  He had a GAF score of 55.[8]  (Tr. 164.)

 Dr. Yuzefovich diagnosed Plaintiff as having a mood disorder, manifested by a lack of

energy, social isolation, low self-esteem, and overeating.  (Id.)  Dr. Yuzefovich also diagnosed

Plaintiff with dysthymic disorder[9] and a personality disorder[10] with narcissistic features.[11]  (Tr.

---

 [7] SERV Centers of NJ, Inc. ("SERV") is an organization that provides living arrangements, treatment, and support for people discharged from the hospital, while they find some form of assistance, employment or housing of their own.  (Tr. 34; see generally SERV Behavioral Health System, Inc., http://servbhs.net/blog/category/about-us/ (last visited June 26, 2008.))

 [8] A GAF scale ranges from 0 to 100.  Generally, a lower score indicates a more serious mental disorder.  A scale of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities."  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 34 (Text Revision 2000).  A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect, circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  (Id.)

 [9] Dysthymic disorder is "a disorder of mood in which the essential feature is a chronic disturbance of mood of at least two years' duration.  It involves either depressed mood or loss of interest or pleasure in all or almost all usual activities and pastimes, and associated symptoms, but not of a sufficient severity and duration to meet the criteria for a major depressive episode." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 564 (6th ed. 2002).

 [10] Personality disorder is "a DSM-IV psychiatry disorder characterized by disruption in relatedness.  It is manifested in any of a large group of mental disorders characterized by rigid, inflexible, and maladaptive behavior patterns and traits that impair a person's ability to function

163.)  In addition, Plaintiff was diagnosed with poor role functioning, manifested by an inability to

hear feedback, a strong character, and difficulty adjusting to changes.  (Tr. 165.)

Plaintiff reported that the Club's program was not stimulating enough for him.  (Tr. 164.)

Over time, Plaintiff's attendance for treatments decreased.  (Tr. 165.)  The treatment plan noted,

however, that Plaintiff was able to care for himself, had some work skills, and was willing and able

to use his training when he attended the Club.  (Tr. 164.)

3.     Dr. Ronald Bagner

In a report dated August 17, 1999, Dr. Ronald Bagner, from Central Jersey Medical

Evaluations, described the conclusions he reached after performing a physical examination on

Plaintiff.  Dr. Bagner found normal cervical flexion, extension, as well as normal lateral flexion

and rotation.  (Tr. 129.)  Plaintiff's grip strength was rated 5/5.  (Id.)  There was no motor or

sensory abnormality in Plaintiff's upper extremities.  (Id.)  Dr. Bagner also noted that Plaintiff

ambulates without difficulty.  (Tr. 130.)  Furthermore, there was normal range of motion in his

right shoulder.  (Tr. 130.)

Nevertheless, Dr. Bagner concluded that Plaintiff had tendinitis in the right shoulder.  (Tr.

130.)  Dr. Bagner also diagnosed Plaintiff, who at the time weighed 314 pounds, as obese.  (Tr.

129, 130.)

---

in society by severely limiting adaptive potential."  MOSBY'S MEDICAL, NURSING, & ALLIED
HEALTH DICTIONARY 1323 (6th ed. 2002).

[11] Narcissistic personality disorder is "a psychiatric diagnosis characterized by an
exaggerated sense of self-importance and uniqueness, an abnormal need for attention and
admiration, preoccupation with grandiose fantasies concerning the self, and disturbances in
interpersonal relationships, usually involving the exploitation of others and lack of empathy."
MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1152 (6th ed. 2002).

Dr. Bagner also examined Plaintiff on February 3, 2004.  (Tr. 432.)  Plaintiff complained of pain in his right shoulder that he had experienced over the past twelve to eighteen years.  (Id.)  An MRI of Plaintiff's right shoulder, performed on December 12, 1999, showed no evidence of a rotator cuff tear.  (Id.)  A physical examination revealed pain upon movement of the right shoulder. (Id.)  The right shoulder showed an active range of motion of zero to ninety degrees of forward elevation, and zero to ninety degrees of abduction.  (Id.)

Plaintiff has also complained of pain in his right ankle since age eighteen.  (Id.)  An ankle X-ray showed no fracture or malalignment.  (Id.)  Currently, Plaintiff is not taking any medication for these ailments.  (Id.)  Dr. Bagner also noted that Plaintiff is obese and ambulates slowly, but does not use a cane or crutches.  (Tr. 433.)

4.    Dr. Mark Friedman

Dr. Mark Friedman evaluated Plaintiff on October 11, 2000.  (Tr. 175.)  Plaintiff had experienced difficulty with his knees for the past couple of years, including pain and stiffness. (Id.)  Plaintiff reported difficulty moving his right shoulder, due to an injury he suffered in an accident while working in a cosmetic factory.  (Id.)  Plaintiff's shoulder hurt even when at rest, and Plaintiff experienced weakness and difficulty lifting.  (Id.)

Dr. Friedman noted that Plaintiff had normal range of motion, strength, and sensation in his cervical spine.  (Id.)  Plaintiff also had normal range of motion, strength, and sensation in his upper extremities, except in the right shoulder.  (Id.)  "He ha[d] pain where the pectoralis muscle insert[ed] into the right shoulder and this bother[ed] him on palpitation and over the anterior of the shoulder."  (Id.)  Dr. Friedman noted that Plaintiff "has had a MRI of this area," but was "not sure of this," because he did "not have those results."  (Id.)  Because of the pain, Plaintiff had some

10

decreased strength in his right shoulder, as compared to the left shoulder.  (Tr. 176.)

In sum, Dr. Friedman found that, physically, Plaintiff's main difficulty relates to his right shoulder, since Plaintiff likely suffers from chronic tendinitis of the shoulder.  This condition caused Plaintiff's restricted motion, impaired function, impaired ability to lift, and decreased range of motion.  (Id.)  Mentally, Dr. Friedman concluded, Plaintiff is obviously depressed.  (Id.)

5.    Dr. Joseph Buceta

Dr. Joseph Buceta evaluated Plaintiff on August 17, 1999.  (Tr. 133.)  According to Dr. Buceta, Plaintiff did not want to be examined by outpatient psychiatrists or other mental health workers.  (Id.)  Dr. Buceta noted that Plaintiff prepares his own meals and does his own laundry, shopping, and cleaning.  (Tr. 134.)  Plaintiff also walks, rides a bike, and goes to the pool.  (Id.)

Dr. Buceta diagnosed Plaintiff as obese, with tendinitis in his right shoulder.  (Id.)  He also found that Plaintiff suffered from major depressive disorder, without psychotic features and chronic mental illness.  (Id.)  Dr. Buceta assessed Plaintiff's GAF score to be 65 to 70.[12]  (Tr. 135.)

6.    University of Medicine and Dentistry of New Jersey: University Behavioral Health Care

Mark E. Williams, a clinician, and Dr. Julie Leib, a psychiatrist, evaluated Plaintiff on April 19, 1999.  (Tr. 159.)  Plaintiff did not have suicidal or violent ideations.  (Tr. 161.)  Mr. Williams and Dr. Leib concluded that Plaintiff will need supportive counseling and medication in order to re-enter the workforce and become more stable in the community.  (Tr. 162.)

_____

[12] A GAF score of 61 to 70 indicates that Plaintiff has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 34 (Text Revision 2000).

In addition, several individuals in the clinical staff at UBHC completed treatment notes for Plaintiff covering the period from May 2, 2003 to July 2, 2003.  On May 2, 2003, an initial evaluation by a social worker indicated that Plaintiff's mood, judgment, insight, and concentration were good.  (Tr. 409.)  The treatment notes stated that Plaintiff's mood was stable.  (Id.)  The treatment notes also stated that Plaintiff did not attend the scheduled job training, but was planning a vacation to attend a medieval festival.  (Id.)

Nevertheless, several of Plaintiff's goals set forth in treatment had been met.  (Id.)  Plaintiff was not experiencing suicidal ideations.  (Id.)  Plaintiff's intelligence was measured to be above average.  (Tr. 413.)  His concentration and attention, memory, and abstract thinking were all intact. (Id.)  Furthermore, a report dated May 22, 2003 noted that Plaintiff had moved into independent housing, and that he was compliant with his medication and treatment.  (Tr. 415.)  Although Plaintiff shows an ability to integrate with his peers, Plaintiff was found to be socially isolated, and to have a lack of energy, low self-esteem, a negative disposition, and problems with overeating. (Id.)

Plaintiff was also diagnosed with moderate vocational stress, characterized by difficulty being around and getting along with other people due to "negativity, [] expectations [and] grandiosity."  (Tr. 417.)  Other problems noted included "self care deficit," difficulty managing weight, poor diet, and a sedentary lifestyle, characterized by obesity and inactivity.  (Tr. 419.)

The recommended plan of action entailed assisting Plaintiff to find employment, despite the fact that Plaintiff did not feel he was ready to gain employment.  (Tr. 418.)  The goal set forth in Plaintiff's treatment plan directed Plaintiff to apply for a job within the community.  (Id.)

An initial UBHC evaluation, dated May 2, 2003 and completed by Richard Rothman, a

primary therapist, reported Plaintiff was overweight and had an uncooperative attitude and unremarkable speech and mood.  (Tr. 426.)  The report also noted suicidal ideation.  (Id.)  Plaintiff, however, was alert, fully oriented, and had intact concentration, memory, and abstract thinking.  (Tr. 427.)  Also, Plaintiff's insight and judgment were deemed to be good.  (Id.)  Plaintiff was diagnosed with dysthymic disorder.  (Tr. 428.)

An evaluation dated December 5, 2000 by Jernee Montoya, a UBHC mental health clinician, stated Plaintiff is "dysthymic in mood," with grave difficulty coping with current life stressors.  (Tr. 197.)  His "grandiosity impairs his ability to problem-solve, and he suffers from anhedonia[13] and low energy level."  (Id.)  "He has low frustration tolerance, [which] causes him to have difficulty getting along with others.  (Id.)  "[T]hese symptoms interfere with Plaintiff's ability to sustain gainful employment over a long period of time."  (Id.)

Another medical report[14] from UBHC by Tony Grelicha, a habilitation counselor, stated that Plaintiff has difficulty accepting feedback from staff or peers at times due to his "grandiosity."  (Tr. 198.)  Plaintiff does not attend the Club program on a consistent basis, although he verbally agreed to attend three days a week.  (Id.)  He constantly complains of the physical difficulties he experiences due to his shoulder, ankle, and chest pains.  (Id.)  Plaintiff also has difficulties socializing and working with others.  (Id.)  "These behaviors interfere with his ability to sustain gainful employment over a long period of time."  (Id.)

      7.    <u>Trenton Psychiatric Hospital</u>

---

[13] Anhedonia is "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable.  It is often a characteristic of major depression and schizophrenia." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 99 (6th ed. 2002).

[14] This report does not reference expressly the date on which it was composed.

Plaintiff was admitted as a patient at Trenton Psychiatric Hospital, due to his depression, from August 8, 1998 to April 12, 1999.  (Tr. 335.)  Plaintiff's medical history indicated that he had previously been admitted at UBHC from July 31, 1998 to August 6, 1998, and was thereafter discharged to a homeless shelter.  (Id.)  At that time, Plaintiff became depressed, and thought of cutting his carotid artery with scissors or a knife.  (Id.)

During intake at Trenton Psychiatric Hospital, Plaintiff appeared to be unpredictable and disheveled, with poor hygiene.  (Tr. 336.)  However, his speech was coherent and relevant, and he was able to give "goal-directed answers" to questions.  (Id.)  Plaintiff's diagnosis was "major depression recurrent in remission, personality disorder NOS,[15] and obesity."  (Id.)

Upon discharge, Plaintiff was oriented, coherent, and relevant, and had appropriate affect and fair insight, judgment, and memory.  (Id.)  In addition, Plaintiff was found not to be a danger to himself, others, or property.  (Tr. 337.)  He denied experiencing depression, hallucinations, or suicidal or homicidal ideations at the time of discharge.  (Id.)

8.    Saint Peter's University Hospital

Saint Peter's University Hospital completed outpatient records for Plaintiff, dated November 23, 1999 through October 15, 2002, which documented several evaluations and diagnoses.  (Tr. 350-408).  Saint Peter's University Hospital diagnosed Plaintiff with obesity, depression, and probable osteoarthritis.  (Tr. 398, 404.)  Plaintiff was also diagnosed with

---

[15] When several core features of a particular diagnosis are present, but individual characteristics do not give rise to any one subcategory, a description of "NOS," meaning "Not Otherwise Specified," is given.  A diagnosis followed by "NOS" does not put the principal diagnosis in doubt.  Honorable Jessie B. Gunther, *Reflections On the Challenging Proliferation Of Mental Health Issues In The District Court And The Need for Judicial Education*, 57 ME. L. Rev. 541, 552 n.43 (2005) (defining NOS).

14

"probable sinusitis," as well as allergic rhinitis.[16]  (Tr. 386, 392.)

Plaintiff's medical record noted ankle pain, depression, and increased cholesterol.  (Tr.

381.)  Plaintiff was also found to have increased cholesterol levels, right shoulder and ankle pain,

and bilateral arthralgia.[17]  (Tr. 378.)  However, X-ray results of Plaintiff's ankles and the right

shoulder did not evidence a fracture or malalignment.  (Tr. 374-75.)  On September 25, 2001,

Plaintiff's MRI results did not suggest a rotator cuff tear, and his shoulder X-ray results indicated

possible osteoarthritis.  (Tr. 363.)  On October 15, 2002, Plaintiff was noted to be losing weight,

due to a healthy diet and exercise.  (Tr. 354.)

      9.    <u>Dr. Jackie Farnese</u>

Dr. Jackie Farnese drafted a report after having a consultative examination with Plaintiff.

The report, dated October 10, 2000, noted that Plaintiff sees his sons once a month, and talks to

them on a weekly basis.  (Tr. 171.)  Plaintiff has a good relationship with his father, a cordial

relationship with his ex-wife, and a fair relationship with his children.  (Tr. 172.)  Plaintiff reported

being depressed approximately three to four times a week.  (Tr. 171.)  He also reported having a

decrease in appetite, reduced motivation and concentration, and feelings of isolation.  (<u>Id.</u>)

However, Plaintiff felt great when he went on vacation two weeks prior to the evaluation, and he

denied having any suicidal ideations.  (<u>Id.</u>)

The evaluation of Plaintiff's mental status stated that he had good to fair motivation.  (Tr.

173.)  Plaintiff's thought process was coherent, logical, and relevant.  (<u>Id.</u>)  His affect was mildly

---

[16] Rhinitis is "inflammation of the mucous membranes of the nose."  MOSBY'S MEDICAL,
NURSING, & ALLIED HEALTH DICTIONARY 1506 (6th ed. 2002).

[17] Arthralgia is joint pain.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY
136 (6th ed. 2002).

depressed, but his judgment was intact and his estimated level of intelligence functioning was average to above average.  (Id.)  Plaintiff was diagnosed with depressive disorder, personality disorder, and obesity.  (Id.)  Dr. Farnese's prognosis for Plaintiff was fair to poor.  (Tr. 174.)

Dr. Farnese evaluated Plaintiff again on December 31, 2003.  (Tr. 429.)  At that time, Plaintiff had been in a positive relationship for the past year.  (Id.)  He lived alone in "supportive housing."[18]  (Id.)  He was also driving and shopping more often.  (Tr. 430.)  Nevertheless, Plaintiff stated that he still experienced bouts of depression.  (Tr. 429.)  He reported being depressed three times per week.  (Id.)  He cried, isolated himself, and felt helpless.  (Id.)  He reported having some suicidal ideations a few months ago, but had not experienced any recently.  (Id.)

At the time of this examination, Dr. Farnese noted, Plaintiff "is currently not in any treatment."  (Id.)  Plaintiff was taking forty milligrams of Prozac each day; however, he ceased taking the medication after he finished his supply because he could not afford to purchase more. (Tr. 429-30.)

Dr. Farnese evaluated Plaintiff's physical, social, and mental condition.  She noted Plaintiff weighed 285 pounds.  (Tr. 430.)  Plaintiff was friendly, cooperative, and found Dr. Farnese to be helpful.  (Id.)  Dr. Farnese noted that Plaintiff had good motivation.  (Id.)  Furthermore, Plaintiff's thought processes were coherent, logical, and relevant.  (Tr. 431.)

Dr. Farnese diagnosed Plaintiff with a depressive disorder and a personality disorder.  (Id.)

---

[18] At the hearing dated May 18, 2001, Plaintiff testified that he shared an apartment provided by SERV Centers of New Jersey, Inc. with three other people.  (Tr. 34-35.)  This housing situation provided Plaintiff, and the others, with a supervised living arrangement.  That living arrangement is referred to as "supportive housing."  (Tr. 429.)  At the hearing dated May 12, 2004, Plaintiff testified that he lived in a similar situation, but he no longer shared the apartment with other people, and received less supervision.  (Tr. 225.)

His prognosis was assessed as fair to poor.  (Id.)

      10.    Residual Functional Capacity Assessments

A residual physical functional capacity assessment form,[19] dated September 14, 1999, noted Plaintiff's physical limitations.[20]  (Tr. 136-43.)  The exertional limitations section of the RFC asserted that Plaintiff could occasionally lift and/or carry (including upward pulling) a maximum of fifty pounds.  (Tr. 137, 143.)  Plaintiff can frequently lift or carry (including upward pulling) a maximum of twenty-five pounds.  (Tr. 137.)  Plaintiff can stand and/or walk (with normal breaks) for a total of approximately six hours in an eight-hour workday.  (Id.)  Plaintiff can sit (with normal breaks) for about six hours in an eight-hour workday.  (Id.)  Plaintiff's ability to push and/or pull (including operation of hand and/or foot controls) is limited in his upper extremities.  (Id.)  Plaintiff's ability to reach in all directions, including overhead, was unlimited.  (Tr. 139.)

An RFC dated November 7, 2000 noted that Plaintiff could occasionally lift fifty pounds; frequently carry twenty-five pounds; stand and/or walk about six hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday.  (Tr. 188, 194.)  However, Plaintiff's ability to push and/or pull was limited in his upper extremities.  (Tr. 188.)

---

[19] Residual functional capacity ("RFC") is defined as "what a [claimant] can still do despite his limitations."  20 C.F.R § 404.1505(a)(1) (West, Westlaw through June 19, 2008). The Functional Capacity Assessment form is used to record summary conclusions derived from the evidence in file. (Tr. 437.) "Each mental activity is to be evaluated within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis."  (Id.)  The evaluation form is composed of four main categories: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; (4) adaptation. (Tr. 437-8.) To rate each area, a five-point scale is used: "not significantly limited, moderately limited, markedly limited, no evidence of limitation in this category, and not ratable on available evidence."  (Id.)

[20] This Court cannot discern, from the signature, the author of this residual physical functional capacity assessment form.  (Tr. 143.)

_____11.    Dr. Sanford

_____Dr. Sanford[21] completed a mental RFC of Plaintiff.  The RFC, dated September 15, 1999, noted Plaintiff was moderately limited in the ability to understand and remember detailed instructions.  (Tr. 153.)  Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods of time, sustain ordinary routine without supervision, and make simple work-related decisions.  (Tr. 153-54.)  Plaintiff was evaluated as moderately limited in his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness or cleanliness.  (Tr. 154.)

Dr. Sanford also completed a Psychiatric Review Technique Form ("PRTF")[22] regarding Plaintiff.  The PRTF, dated September 15, 1999, noted Plaintiff was diagnosed with affective disorders and personality disorders.  (Tr. 144.)  Plaintiff was also diagnosed with major depression.  (Tr. 147.)  Plaintiff was described as having inflexible and maladaptive personality traits, which cause either significant impairment in social or occupational functioning, or subjective distress.  (Tr. 149.)  Plaintiff was found to be moderately restricted in activities of daily living, and in maintaining social functioning, but often experienced deficiencies in concentration, persistence, or pace, resulting in a failure to complete timely tasks in work settings and elsewhere.  (Tr. 151.)

---

[21]  Dr. Sanford's first name is not referenced in the record.

[22]  20 C.F.R. § 404.1520a(b)(3) provides for examination of the degree of functional loss in four areas of function considered essential for employment.  These areas of activities include: (1) daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) deterioration or decompensation in work or work-like settings. The degree of functional loss is rated on a scale that ranges from "no limitation" to "limitations so severe the claimant cannot perform these work-related functions."  This information is then detailed on a PRTF.

12.      Dr. Filippone

Dr. Filippone[23] assessed Plaintiff's mental functional capacity on February 20, 2004.  (Tr. 439.)  He indicated that Plaintiff was not significantly limited in the category of understanding and memory.  (Tr. 437.)  Dr. Filippone rated Plaintiff as moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 437-8.)  Plaintiff was rated as moderately limited in his ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  (Tr. 438.)

Dr. Filippone noted at the end of the mental RFC that Plaintiff did not accomplish his goal to search for employment.  (Tr. 439.)  Dr. Filippone also noted that Plaintiff's affect was somewhat frustrated.  (Id.)  Plaintiff had some limitations in his capacity to set goals and to relate to others.  (Id.)  Although Plaintiff's adaptiveness was limited, it was not limited at marked levels.  (Id.)  Furthermore, Dr. Filippone found Plaintiff to be coherent, logical, and "relevant."  (Id.)  Lastly, Dr. Filippone assessed Plaintiff as being capable of performing the mental demands associated with unskilled work, and noted that Plaintiff does not "meet or equal a mental listing."  (Id.)

Dr. Filippone also completed a Psychiatric Review Technique Form ("PRTF"), dated February 20, 2004.  (Tr. 441.)  He noted on the form that Plaintiff had "affective disorders" and "personality disorders."  (Id.)

_____

[23]  Dr Filippone's first name is not referenced in the record.

13.   SERV Centers of New Jersey, Inc.

A clinician[24] completed a comprehensive individualized treatment plan and a bio-psycho-social reassessment for Plaintiff, both dated February 17, 2000.  (Tr. 169-70.)  Both documents stated Plaintiff's principal diagnosis to be recurrent major depressive disorder.  (Tr. 169.)  The treatment plan described the criteria for discharge as 1) obtaining sufficient income to support himself financially; 2) obtaining a positive attitude in order to minimize depression; and 3) maintaining a sanitary apartment.  (Id.)

A SERV Center clinician, Kim Tucker ("Tucker"), delineated her observations of Plaintiff in a medical report dated November 27, 2000.  (Tr. 196.)  Since September of 2000, Tucker had been working with Plaintiff at SERV Centers as his clinician by providing outpatient services to him on a weekly basis.  (Id.)  During that time, Tucker noticed that Plaintiff had a number of symptoms of depression.  (Id.)  Plaintiff lacked energy and had decreased motivation, an increased need for sleep, and a tendency to isolate himself in his bedroom during the week.  (Id.)  Plaintiff also frequently complained of shoulder, knee and ankle pain.  (Id.)  Tucker noted that Plaintiff's negative outlook leaves him feeling hopeless that "his future is bleak if he does not receive Social Security [B]enefits."  (Id.)  Tucker also noted that, although Plaintiff feels he has a multitude of problems, he has the ability to work part-time, "but does not feel he would be able to earn enough money to support himself."  (Id.)

---

[24]  This Court cannot discern, from the signature on the report, the name of the clinician.  (Tr. 169-70.)

15.     Central Jersey Medical Evaluations

In a medical evaluation dated February 3, 2004, Dr. Hiremath,[25] a radiologist, stated that Plaintiff's "right shoulder with the upper humerus fails to demonstrate any evidence of acute fracture or dislocation.  No intrinsic bone, periosteal, joint or soft tissue abnormality is observed." (Tr. 436.)  Dr. Hiremath's impression of Plaintiff's right shoulder was normal.  (Id.)

## III. DISCUSSION

**A.     Standard of Review**

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

_____

[25] Dr. Hiremath's first name is not referenced in the record.

In the determination of whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age."  Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion. Blalock, 483 F.2d at 775.

**B.      Statutory Standards**

        The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. § 423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if he is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results from anatomical,

22

physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

**C.     The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520. At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[26] 20 C.F.R. § 404.1520(b). If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied. Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(a)(ii)(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Id. In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered. See id. If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 404.1594(f)(2). If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act. If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third

---

[26] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

Circuit found that to deny a claim at step three, the ALJ must specify which listings[27] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.  (Id.)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which

---

[27] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that claimant can perform, claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, such as age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the jobs in the national economy that exist for particular combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how

25

a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x. 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.**     **ALJ De Steno's Findings**

ALJ De Steno applied the five-step sequential evaluation, and determined that Plaintiff was disabled from July 15, 1998 through September 30, 2000.  (Tr. 218.)

    1.     Step One

ALJ De Steno found that Plaintiff satisfied step one of the evaluation process because he "ha[d] not engaged in any substantial gainful activity at any time since the alleged onset date."  (Tr. 209.)

    2.     Step Two

Regarding step two, ALJ De Steno found that:

> The evidence establishe[d] that the claimant has suffered from tendonitis [sic] in the right shoulder, obesity, depression, and a personality disorder, which are severe impairments within the meaning of the Social Security Act.

(Id.)  To reach this conclusion, ALJ De Steno relied in part on reports from Plaintiff's treating

26

psychologist, Dr. Sapp, who stated that Plaintiff's symptoms consisted of suicidal ideation and depression.  (Id.)  ALJ De Steno also noted that, on August 17, 1999, a psychiatric consultative examination diagnosed Plaintiff with major depressive disorder.  (Tr. 210.)  Furthermore, ALJ De Steno commented that Plaintiff was a patient at Trenton Psychiatric Hospital receiving treatment for depression from August of 1998 to April 12, 1999.  (Id.)  There, Plaintiff had considered suicide, and was unpredictable, disheveled, and had poor hygiene.  (Id.)  Upon discharge, Plaintiff was oriented, coherent, and relevant, and had appropriate affect and fair insight, judgment, and memory.  (Id.)

3.    Step Three

ALJ De Steno found that Plaintiff's "subjective complaints of disabling mental distress, pain and other symptoms and limitations precluding all significant work activity are generally credible and consistent with Social Security Ruling 96-7 and 20 C.F.R. §§ 404.1529 and 416.929 for the period running from July 15, 1998 through September 2000, but not thereafter."  (Tr. 213.) In evaluating Plaintiff's subjective complaints, De Steno considered:

> (1) the nature, location, onset, duration, frequency, radiation and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4) treatment, other than medication for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities and work record.

(Id.)

Plaintiff's impairments satisfied the listings until September 2000.  (Tr. 213-14.)  ALJ De Steno noted that "the evidence regarding the claimant's mental impairment establishes that claimant has suffered from a depressive disorder within the meaning of medical listing 12.04A1 (a,e,g,h), Appendix 1, Subpart P, Regulations No. 4 with anhedonia, decreased energy, difficulty

concentrating, and thoughts of suicide; and a personality disorder within the meaning of listing 12.08A4 with persistent disturbances of mood or affect." (Tr. 213.) ALJ De Steno also determined that, for the period running from July 15, 1998 through September 30, 2000, Plaintiff's "impairment met the criteria of sections 12.04 and 12.08 of the impairments listed in Appendix 1, Subpart P of the regulations (20 C.F.R., Part 404)," and was disabled. (Tr. 214.)

For the period after September 30, 2000, however, ALJ De Steno found that Plaintiff's mental condition improved medically, such that he no longer met any listing. (Id.) To reach this conclusion, ALJ De Steno relied on Dr. Farnese's report, dated October 10, 2000, which indicated that Plaintiff was cooperative and had good to fair motivation, clear speech, and a logical and relevant thought process. (Id.) The report also stated that, although Plaintiff's affect was mildly depressed, he was oriented, his memory was good, and his judgment was intact. (Id.)

Based on this report, and in conjunction with Plaintiff's testimony at the first hearing regarding his ability to complete therapy and perform a wide variety of daily activities, ALJ De Steno found that Plaintiff had medically improved, by October 1, 2000, such that he no longer met any of the medical listings. (Id.)

As for Plaintiff's physical impairments, ALJ De Steno ultimately found that "the evidence fails to establish the claimant's impairments have met or equaled in severity, any impairment listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 214.) ALJ De Steno concluded that the severity of the shoulder impairment did not satisfy the "requirements of listing 1.02." (Id.). ALJ De Steno also noted that there is no specific medical listing regarding obesity, but "the impairment has been evaluated pursuant to the guidelines in SSR 02-1p." (Id.)

4.     Step-Four

Based on all the evidence in the record, ALJ De Steno found that Plaintiff, since October 1,

28

2000, has had the residual functional capacity to perform work involving lifting and carrying objects weighing up to twenty-five pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and performing medium work involving no greater than the types of simple tasks associated with unskilled work.  (Id.)  When taking into consideration Plaintiff's complaints of pain in his right arm, Plaintiff would have the RFC for lifting and carrying objects weighing up to twenty pounds; frequently lifting and carrying objects weighing up to ten pounds; and pushing and pulling left arm controls and leg controls (without lifting the right arm above shoulder level).  (Tr. 214-15.)  Based on this information, ALJ De Steno concluded that, "due to the exertional or skill levels of [plaintiff's past employment] and considering claimant's limitation to simple tasks, he has not had the capacity to perform any of his past relevant work."  (Tr. 216.)

     5.    <u>Step-Five</u>

     Although Plaintiff's medical impairments have prevented him from engaging in his past relevant work, ALJ De Steno found that Plaintiff was not barred from doing other gainful activity that exists in significant numbers in the national economy.  (Tr. 217.)  Considering Plaintiff's age, education, work experience, and RFC for the period since October 1, 2000, ALJ De Steno found that jobs exist in significant numbers that Plaintiff has had the capacity to perform.  (Id.)  ALJ De Steno used, as a framework, "the medical-vocational rules 203.29 and 203.22, Appendix 1, Subpart P, Regulations No. 4," and relied on the expert testimony of vocational expert Rocco Meola to formulate his conclusion.  (Id.)

     Meola testified that a person with Plaintiff's limitations could work in unskilled jobs such as a packer, a hardware assembler, a staple machine operator, or a bagger.  (Tr. 216.)  Meola explained that there are approximately 2000 such jobs in the region; 10,000 such jobs in the New

York metro area; and approximately 20,000 such jobs when including those in the state of New Jersey.  (Id.)  Also, when taking into account Plaintiff's right arm impairment, his ability to carry and lift less weight, and his mental capacity for unskilled work, Meola testified that a person with such limitations could be a garment sorter, a scale operator, a produce weigher, or a label machine operator.  (Tr. 216-17.)  Meola stated that there are approximately 1500 such jobs in Northern and Central New Jersey; about 15,000 such jobs in New York; and 30,000 such jobs when including those in the entire state of New Jersey.  (Tr. 217.)  Based on those findings, ALJ De Steno concluded that there are other jobs, which exist in significant numbers in the national economy, that Plaintiff can perform.  (Tr. 217-18.)

**E.**     **Analysis**

Plaintiff asserts that "substantial evidence exists in the administrative record to support a finding of disability," and that, therefore, ALJ De Steno's decision should be reversed or, in the alternative, remanded to the Commissioner for further consideration.  (Pl.'s Br. 6.)   Plaintiff contends that ALJ De Steno erred at step five of the analysis by: 1) submitting inadequate hypothetical questions to the vocational expert; and 2) ignoring and/or failing to reject contradictory evidence proffered by the vocational expert.

   1.     Whether the ALJ Submitted Hypothetical Questions to the Vocational Expert That
          Fairly Set Forth Plaintiff's Limitations

Plaintiff argues that the hypothetical questions ALJ De Steno posed to Meola did not adequately "reflect the vocational realities of the medical record."  (Pl.'s Br. 14.)  Plaintiff contends that ALJ De Steno's "three hypothetical questions claim[ed] no specific source [or] material in the evidence of record."  (Pl.'s Br. 15.)  For those reasons, Plaintiff argues that the hypothetical questions ALJ De Steno posed to Meola cannot constitute the basis of ALJ De Steno's

determination that a significant number of jobs exist in the national economy which Plaintiff could perform.

Hypothetical questions posed to the vocational expert must accurately convey all of a claimant's credible limitations that are substantiated by the evidence.  See Plummer v. Apfel, 186 F.3d 422, 431 (3d. Cir. 1999).  When an expert provides testimony in response to a hypothetical that fairly and adequately sets forth all credible limitations established by the evidence, the Commissioner may rely on such testimony to support the conclusion that the individual can perform work activity.  See id.; see also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

The Third Circuit does not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.  However, the hypotheticals posed must "accurately portray" the claimant's impairments, and the expert must be given an opportunity to evaluate those impairments as "contained in the record."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).  The Circuit has "established some guidelines as to when a limitation is credibly established . . . .  Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response."  Rutherford, 399 F.3d at 554 (citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)).  If, however, a hypothetical question posed to a vocational expert fails to reflect "all of a claimant's impairments that are supported by the record," the expert's response to that question cannot be considered substantial evidence.  Chrupcala, 829 F.2d at 1276.

ALJ De Steno posed three hypothetical questions to Meola.  However, in formulating his conclusion that Plaintiff was capable of performing other work which exists in the national economy, ALJ De Steno relied upon Meola's responses to only two of his hypothetical questions.

(See Tr. 216-17.)  The first hypothetical question was explained as follows:

> Considering an individual born in September of 1951 with a high school education, and the past relevant experience that the claimant has had, and the following residual functional capacity: lifting and carrying objects weighing up to fifty pounds, and frequently lifting and carrying objects weighing up to twenty-five pounds; sitting, standing and walking up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and the types of simple tasks associated with unskilled work  Are there jobs in the region that such an individual could perform?

(Tr. 235-36.)  ALJ De Steno's second hypothetical posed the following question:

> Consider an individual of the claimant's age, education, and work background with the residual functional capacity for lifting and carrying objects weighing up to fifty pounds, and frequently lifting and carrying objects weighing up to ten pounds. Sitting, standing and walking up to six hours in an eight-hour day.  Pushing and pulling left arm but not right arm controls without requiring lifting the right dominant arm above the shoulders.  Are there jobs in the region that such an individual could perform? . . . [L]et me add the other thing I said also applies involving the types of simple tasks associated with unskilled work.  That also applies.

(Tr. 238.)[28]

"While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's

---

[28]  In his third hypothetical question, ALJ De Steno asked,

> Now if we add on that the individual could not keep a regular schedule, and could not handle any significant stress, and could not interact with other individuals, and could not sustain concentration to any significant degree.  Would any of these jobs or any other jobs exist in significant numbers?

(Tr. 240.)  Meola responded by stating, "No, Your Honor, with those limitations . . . [i]n my opinion, a person would not be able to work in the competitive labor market."  (Id.)  Since ALJ De Steno did not rely on Meola's answer to this third hypothetical to find that Plaintiff was capable of performing other jobs, this Court need not analyze the appropriateness of this hypothetical.

individual physical and mental impairments." Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984) (citing Tennant v. Schweiker, 682 F.2d 707, 711 (8th Cir. 1982)).  Thus, the expert must have evaluated claimant's particular impairments as contained in the record.  Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983) (per curiam) ("The assumptions contained in the hypothetical questions proffered by the ALJ must accurately portray the nature and extent of Plaintiff's impairment as contained in the record."); see also Rutherford, 399 F.3d at 553-554; McGhee v. Harris, 683 F.2d 256, 259 (8th Cir. 1982) ("It is essential that the record clearly indicate that the vocational expert considered the particular individual disabilities of the claimant in evaluating [his] ability to perform alternative employment.  The response to a fatally defective question cannot constitute substantial evidence.").

ALJ De Steno's characterization of Plaintiff's limitations in the two hypothetical questions is incomplete.  See Podedworny, 745 F.2d at 218.  Specifically, the two hypothetical questions failed to include Plaintiff's psychological and psychiatric impairments, such as his depression, anhedonia, dysthymic disorder, and personality disorder, NOS.  (See Tr. 125, 134, 147, 149, 163-5, 337, 381, 404, 428-29, 431, 439.)  These omissions from the hypothetical questions "run[] afoul of our directive . . . that a 'hypothetical question posed to a vocational expert must reflect all of a claimant's impairments,' . . . , as well as our statement . . . that 'great specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." Ramirez, 372 F.3d at 554-55 (quoting Chrupcala, 829 F.2d at 1276; Burns v. Barnhart, 312 F.3d 113, 122 (3d Cir. 2002)).  ALJ De Steno's hypotheticals failed to specify Plaintiff's mental impairments that were referenced throughout the record.

Meola's testimony responding to the aforementioned hypotheticals is the only evidence supporting ALJ DeSteno's conclusion that there exist jobs in the national economy which Plaintiff

can perform.  (Tr. 235-39.)  The fact that Plaintiff's impairments were not all included in ALJ De Steno's hypothetical questions rendered those questions, and Meola's responses, defective.  <u>See</u> <u>Podedworny</u>, 745 F.2d at 218; <u>Wallace</u>, 722 F.2d at 1155 (the inadequate portrayal of plaintiff's limitations rendered the vocational expert's testimony deficient); <u>McGhee v. Harris</u>, 683 F.2d 256, 259 (8th Cir. 1982) ("The response to a fatally defective question cannot constitute substantial evidence.")

Meola's responses to the ALJ's deficient hypothetical questions cannot provide substantial evidence to support the determination that a significant number of jobs exist in the national economy which Plaintiff could perform.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, this Court finds that the Commissioner's decision is not supported by substantial evidence.  ALJ De Steno's determination that there exist jobs that Plaintiff could perform is based solely on the vocational expert's testimonial response to the ALJ's hypotheticals, which did not encapsulate all of Plaintiff's impairments and therefore are deficient. As a result, ALJ De Steno's decision shall be vacated, and this case shall be remanded to the Commissioner for further consideration consistent with this Opinion.

 S/Joseph A. Greenaway, Jr.        
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: June 26, 2008

34